Cecil SIMON, a/k/a Cecil Jackson, Petitioner,

v.

UNITED STATES of America, Respondent.

No. CR–90–216CPS.

United States District Court, E.D. New York.

March 17, 2005.

SENTENCING MEMORANDUM

CHARLES P. SIFTON, Senior Judge.

Cecil Simon was convicted in 1990 of one count of conspiring to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 846 and one count of using a firearm in relation to that conspiracy in violation of 18 U.S.C. § 924(c)(1). Previously, the undersigned, with the Government's consent, granted Simon's petition for habeas corpus pursuant to 28 U.S.C. § 2241 and vacated his § 924(c)(1) conviction. For the reasons that follow, on March 15, 2005, I resentenced Simon principally to a term of 262 months imprisonment and five years supervised release.[1]

---

1. In addition, I mistakenly imposed a $100 special assessment. The applicable assess-

*Background*

The following facts are drawn from the amended report of presentence investigation and an addendum to that report prepared in connection with Simon's resentencing, this Court's September 8, 1992, memorandum and order denying petitioner's motion to set aside his sentence due to ineffective assistance of counsel made pursuant to 28 U.S.C. § 2255, and the parties' submissions in connection with the resentencing.

Simon was arrested in February, 1990, and was indicted on March 15, 1990, on various narcotic and drug offenses related to the December 6, 1988, search of his home at 14 Turner Place. Simon was thereafter convicted after trial of one count of conspiring to distribute and possess with intent to distribute in excess of 50 grams of cocaine base in violation of 21 U.S.C. § 846 and one count of using firearms during and in relation to that conspiracy in violation of 18 U.S.C. § 924(c)(1).[2] He was acquitted of possessing cocaine base with intent to distribute.

On August 14, 1990, I sentenced Simon to 322 months of imprisonment. I calculated that Simon's base offense level for the narcotics offense was 36 due to his participation in a conspiracy involving 660 grams of crack. I adjusted that level upward one level to account for Simon's obstruction of justice due to his attempt to alter his handwriting when giving a hand-

writing exemplar to use at his trial. Given Simon's criminal offense history of III, the resulting Guidelines sentencing range for the narcotics offense was 262 to 327 months imprisonment. I sentenced Simon to 262 months on the drug count plus a consecutive statutory 60 month term of imprisonment on the weapons count, for a total term of 322 months. In addition, I imposed four years of supervised release and a special assessment of $100. The Second Circuit affirmed Simon's sentence and conviction on April 3, 1991. *See United States v. Simon*, 932 F.2d 955 (2d Cir. 1991) (table).

On December 27, 1991, Simon filed a motion pursuant to 28 U.S.C. § 2255 to set aside his sentence due to ineffective assistance of his trial counsel. I denied the motion by memorandum and order dated September 8, 1992. Simon appealed, but the Second Circuit dismissed the appeal for failure to comply with its briefing schedule. The Second Circuit denied Simon's motion to reinstate the appeal on August 16, 1993.

In 1996, Simon filed a motion pursuant to 18 U.S.C. § 3582(c)(2), seeking to vacate his weapons conviction in light of *Bailey v. United States*, 516 U.S. 137, 150, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (holding that § 924(c) "requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense.")[3] I observed that

---

ment for Simon's 1990 offense was $50, which Simon has already paid. The filed judgment of conviction corrects this error.

**2.** Section 942(c)(1) provides in pertinent part:

Whoever, during an in relation to any crime of violence or drug trafficking crime...uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years... Notwithstanding any other provision of law, ... the term of imprisonment imposed un-

der this subsection [shall not] run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried.

18 U.S.C. § 924(c)(1).

**3.** Prior to *Bailey*, a defendant in this Circuit was guilty of violating § 924(c) if "[t]he circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available for use during such a transaction."

Simon's motion could not be granted pursuant to § 3582 and that § 2255 relief had become unavailable because of his previous § 2255 motion. I did not, however, dismiss the application on that basis. Relying on the Second Circuit's decision in *Triestman v. United States*, 124 F.3d 361 (2d Cir.1997) (holding that litigants can pursue *Bailey* claims on a § 2241 motion even if a § 2255 motion raising the same challenge would be barred by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, 1220 (1996), I construed petitioner's § 3582 motion as a § 2241 petition.) I vacated Simon's § 924(c)(1) conviction in light of the Government's concession that *Bailey* rendered it invalid, and held that he would be resentenced on his drug conspiracy conviction.[4]

In calculating a new sentence, I began with the offense level 37 that was originally applied to Simon's conspiracy conviction and obstruction of justice enhancement. I then added a two-point enhancement pursuant to section 2D1.1(b)(1) of the United States Sentencing Guidelines ("U.S.S.G."), which requires a two-level increase in a defendant's offense level "if a dangerous weapon (including a firearm) was possessed."[5] This resulted in a final offense level of 39 and a sentencing range of 324 to 405 months. In recognition of Simon's original 322 month sentence, I departed downward, with the Government's consent, and imposed a 322–month term of imprisonment, which was equal to Simon' original sentence.

Simon appealed the sentence, and the Second Circuit held that "in view of the various potential obstacles to relief on successive § 2241 petitions, and in the absence of Simon's consent" the *"sua sponte* recharacterization of his § 3582 motion as a § 2241 petition was improper." *Simon v. United States*, 359 F.3d 139, 145 (2d Cir.2004). The Second Circuit vacated the case and remanded "to give Simon an opportunity to decline to have his § 3582 motion converted into a § 2241 petition."

*United States v. Feliz–Cordero*, 859 F.2d 250, 254 (2d Cir.1988).

4. Prior to the resentencing hearing, Simon filed papers raising several claims, which I declined to address on the ground that they addressed the part of his underlying conviction which had not been vacated and thus, were inappropriately raised during resentencing. I explained that the claims could be raised in a new § 2255 motion, but that such an application would in all likelihood be barred by AEDPA.

5. I was precluded from applying this two-level enhancement for possession of a firearm at the original sentencing because the petitioner had been sentenced under § 924(c)(1). *See* U.S.S.G. § 2K2.4, Comment (n.2 & Backg'd) (to avoid double counting, "[w]here a sentence under [§ 924(c)] is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm...is not to be applied in respect to the guideline for the underlying offense."); *United States v. Howard*, 998 F.2d 42, 48 (2d Cir.1993).

The presentence report recommended application of the enhancement, a recommendation supported by the Government. Simon objected to the adjustment. However, I overruled this objection, reasoning that the gun found in the bedroom was connected with the narcotics conspiracy:

> With regard to the objection to the two point enhancement, because of the presence of firearms in the apartment, I have no hesitation, although indeed neither I nor the government attorney were there in the room to say on the basis of personal knowledge that this was Mr. Simon's room from which he jumped and in which there were found hard guns. Nevertheless it is an almost compelled inference from the evidence that was introduced at the trial that these guns were in Mr. Simon's room, that the room was Mr. Simon's and that they were used in connection with a narcotics conspiracy that was going on.

(Resentencing Tr. at 32)

*Id.* This Court was instructed that if Simon agreed to proceed pursuant to § 2241, the "district court should act on the converted § 2241 petition." *Id.* at 145 n. 12. Although Simon had raised various other claims on appeal regarding his sentence, including the validity of the two-point firearms enhancement, the Second Circuit did not address the validity of those claims, and ruled only on the threshold issue of this Court's *sua sponte* conversion.

Simon advised this Court that having been apprised of the consequences of the conversion, he consented and wished to proceed pursuant to § 2241. Simon argued that his weapons conviction should be vacated as it was in the previous § 3582 application, and that he should have been resentenced on the drug conspiracy charge *de novo;* the Government concurred on both these points. Because of the Supreme Court's intervening decision in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), Simon sought a reduction in his sentence.

### Discussion

Subsequent to Simon's first resentencing, the Supreme Court held in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment. In its remedy opinion, the Court severed 18 U.S.C. § 3553(b)(1), which had rendered the Guidelines binding on federal sentences. *Id.* at 764. This left 18 U.S.C. § 3553(a) in effect, which states:

> The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
>
> (5) any pertinent policy statement—
>
> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statements by act of Congress . . . .
>
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

■ A first step in post-*Booker* sentencing is to determine the applicable Guideline range after making such findings of fact as are necessary, as required by 18 U.S.C. § 3553(a)(4). *United States v. Crosby,* 397 F.3d 103, 112 (2d Cir.2005). Then a court is to consider policy statements issued by the Sentencing Commission, as required § 3553(a)(5). *Id.* This

applicable Guideline range is determined in the same manner as before *Booker. Id.* Once this Guideline range is determined, the court has the duty to "consider" it along with the other factors listed in § 3553(a). *Id.* at 112–13.

The Second Circuit has yet to rule on the "degree of consideration" of the Guidelines that is required, or what weight they are to be given. The Second Circuit has instead opted "to permit the concept of 'consideration' in the context of the applicable Guidelines range to evolve as district judges faithfully perform their statutory duties." *Id.* at 113. In the absence of guidance from the courts of appeals, district courts have differed as to the weight to be given to the formerly mandatory Guidelines. *Compare United States v. Wilson,* 350 F.Supp.2d 910, 925 (D.Utah 2005) (giving "heavy weight" to the Guidelines and only granting non-Guideline sentences in "unusual cases for clearly identified and persuasive reasons"), *with United States v. Peach,* 356 F.Supp.2d 1018 (D.N.D.2005) (giving Guidelines "substantial weight" because they provide a "presumptively reasonable" sentence), and *United States v. Ranum,* 353 F.Supp.2d 984 (E.D.Wis.2005) (giving equal weight to each factor listed in § 3553(a)); *United States v. Myers,* 353 F.Supp.2d 1026 (S.D.Iowa 2005) (same).

■ I adopt the view that the Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a). I do so for three reasons, which have been elaborated upon in the post-*Booker* opinions of several other district courts. First, § 3553(a), the statute that this Court is required to apply, does not distinguish between the weight to be given to any of the factors listed.

Second, the greater the weight given to the Guidelines, the closer the Court draws to committing the act that *Booker* forbids—a Guideline sentence based on facts found by a preponderance of the evidence by a judge. *United States v. Biheiri,* 356 F.Supp.2d 589 (E.D.Va.2005); *United States v. Huerta–Rodriguez,* 355 F.Supp.2d 1019 (D.Neb.2005). Such a regime threatens a *de facto* mandatory sentence.

Third, as discussed in *United States v. Ranum,* 353 F.Supp.2d 984, the Guidelines permit a court to grant a departure based on certain offender-specific characteristics only in "exceptional cases," U.S.S.G. § 5H1.1. For example, age, educational and vocational skills, mental and emotional conditions, physical condition, employment record, and family ties and responsibilities are not normally relevant. U.S.S.G. §§ 5H1.1–6. Yet these are the sort of characteristics a court is likely to find relevant when determining "the history and characteristics of the defendant" as required by § 3553(a)(1). Similarly, § 3553(a)(2)(C) requires a court to consider the need to protect the public from future crimes of the defendant. But at least one post-*Booker* court has noted that the Guidelines fail to consider that recidivism drastically declines with the defendant's age. *See Nellum,* 2005 WL 300073, at *3. Depending on the individual case, giving "heavy" weight to the Guidelines may therefore be in tension, if not conflict, with § 3553(a)'s command to consider a multitude of factors.

That the Guidelines are not accorded "heavy weight" does not mean that a district court's discretion is unfettered. Any sentence imposed by this Court is cabined within the limits of "reasonableness." It is this Court's function to determine, in light of all of the factors provided in § 3553(a), the range of reasonable sentences applicable to this case, and where within that range Simon's sentence lies.

Accordingly, in sentencing Simon, I first determined the sentence recommended by the applicable Guidelines and policy statements, and then considered whether any factor listed in § 3553(a) warranted deviating from the Guidelines' recommendation.

*§ 3553(a)(4) & (5): Advisory Guideline Range*

As previously noted, Simon's base offense level is 36 due to his participation in a conspiracy involving 660 grams of crack. The base offense level was upwardly adjusted by one level due to Simon's obstruction of justice when he attempted to alter his handwriting when giving a handwriting exemplar. A two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), was appropriate because of Simon's possession of a firearm. U.S.S.G. § 2D1.1(b)(1). This results in final offense level of 39. Given Simon's criminal offense history of III, the Guidelines range is 324 to 405 months imprisonment.[6]

*§ 3553(a)(1): Offense Characteristics*

After being advised that the Simon was operating a cocaine processing laboratory, DEA Agents Gerard McAleer and Adele Hanay conducted surveillance of 14 Turner Place in Brooklyn, on December 6, 1988. At 4:00 p.m., a male fitting Simon's general description entered the property accompanied by a female and a child. They left approximately an hour later. The male and female returned to 14 Turner Place at 7:45 p.m. At 10:15 p.m., another male, later identified as Jorge Fuentes, entered 14 Turner Place empty-handed and left moments later with a plastic bag. Fuentes got into a livery cab, which was stopped by DEA Agents Gerard McAleer and Kenneth Dinino. The agents found approximately $32,000 in cash, bundled with rub-

ber bands, in the plastic bag carried by Fuentes. Thereafter, another male, later identified as Michael Wood, entered the premises.

Approximately a half hour later, DEA agents executed a search warrant on 14 Turner Place. Agents Dinino and McAleer, among others, first knocked on the front door and announced themselves as DEA agents. When no one answered, the agents broke down the door with a sledgehammer. While the front door was being broken down, other agents including Agent Hanay proceeded to the rear of 14 Turner Place. Drawn to the noise, a women in a neighboring building looked out her window and saw a man fitting Simon's description jump from the rear of the building. She then yelled to Agent Hanay "they are getting out the back." The agents were unable to locate the fleeing man.

In the building, the agents found Michael Wood and a woman named Patricia Crossman. A window in a rear bedroom was open. In that bedroom, the agents found a loaded .45 caliber semi-automatic pistol under the mattress of the bed and a cellular phone. They also found a variety of documents with Simon's name and, in some cases, signature, using both Simon's real name as well as an alias, Cecil Jackson, on the documents. In another bedroom, agents found over 600 grams of cocaine base of 90% purity, a loaded Tech 9 submachine gun, and a loaded 9 millimeter semi-automatic pistol. In the kitchen, agents found $72,000 in cash, crack vials, glassine bags, a digital scale, ammunition, and a Pyrex pot containing crack residue.

Simon's offense is an extremely serious one, although for the reasons specified be-

---

**6.** Although Simon presents a number of arguments that may be construed as applications for a traditional Guideline departure, none is warranted for the reasons stated at the time of sentencing. Neither defendant's medical condition, family circumstances, lack of guidance as a youth, or post-conviction rehabilitation is so extraordinary as to warrant a departure under the Sentencing Commission policy statements.

low, not as serious as to warrant a penalty based upon a 100:1 ratio with the penalties for powder cocaine.

*§ 3553(a)(1): Offender Characteristics*

Simon was born in Georgetown, Guyana on July 13, 1961. He is one of six children born to Olive Simon and Cecil Simon. Cecil Simon the elder was killed in an accident while working at a rice factory. Simon's mother, a nurse, immigrated to the United States in 1973. While she was gone, Simon stated that he had little contact with her, but he was cared for by friends and aunts. He joined his mother in the United States two years later and was granted permanent residency status. Because of his mother's long work hours, Simon and his siblings were often left on their own for extended periods.

Since 1986, Simon has maintained an intimate relationship with Elaine Almond, with whom he has fathered two daughters. Prior to his arrest, they had planned to marry. Almond reports that Simon had been a caring father, spent time with them on a regular basis, and assisted her in paying for their upbringing. Simon reports that he has tried to use his current predicament to educate his daughters concerning the mistakes he has made. Both of his daughters submitted letters expressing their wish to be reunited with their father.

In addition, Simon's niece and sisters have written to the Court to describe Simon's development since being incarcerated for the instant offense fifteen years ago. They describe him as entering prison as "an angry, defiant young man." They state that he has since become remorseful, weak, frail, and exasperated.

There can be little dispute that Simon has not lived an exemplary life since his arrival in the United States. He was expelled from high school for fighting. In 1980, he was convicted of attempted crimi-nal possession of a weapon after the police found a loaded gun in a car he was riding in. In 1981, he was involved in an altercation in a Brooklyn disco, which resulted in the shooting death of one individual. Simon pled guilty to manslaughter and spent approximately five years in state prison before being paroled. Prior to 2002, Simon had a lamentable prison disciplinary record. Since 2001, however, his record has been marred by only one outbreak, apparently related to the treatment of his many medical problems.

*Health*

The PSR reports that since his incarceration, Simon's health has deteriorated substantially. A blow to the head while at Riker's Island in 1982 caused glaucoma and a ruptured cornea in his left eye, which led to a loss of sight in that eye. Simon stated that he had undergone one operation, and had scheduled a second, which was cancelled due to his conviction for the instant offense. The PSR describes his left eye as containing "gray bubbles," glaucoma, and cataracts. Simon stated that the vision in his right eye is growing blurry, and he feared total blindness.

Additionally, in 1992, while incarcerated for the instant offense, Simon was stabbed in the neck and stomach by an inmate. Simon reported still suffering pain from this attack.

Finally, Simon suffers from colitis, for which he had been prescribed Mesalamine. A report from a recent colonoscopy states that Simon suffered "moderately severe pain," bleeding in his abdomen, "a localized area of erosion in the mid-sigmoid and rectum," "congested mucosa in the colon," and "white exudate . . . in the colon."

Although the Guidelines do not ordinarily account for a defendant's health problems, absent an "extraordinary physical impairment," U.S.S.G. § 5H1.4, post-*Booker* I may consider that Simon's health is

substantially more impaired than most defendants'. This both renders Simon a greater burden on the federal prison system, and incarceration a greater burden on Simon.

*§ 3553(a)(2): the Purposes of Punishment*

Section 3553(a)(2) instructs the Court to consider the purposes of punishment when imposing a sentence, including the need for the sentence:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

§ 3553(a)(2).

*§ 3553(a)(2)(A): The Seriousness of the Offense, Respect for the Law, and Just Punishment*

Section 3553(a)(2)(A) instructs the Court to craft a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. As their grouping within this subsection of the statute reflects, these concepts are interrelated and in this case merit joint consideration.

■ A number of factors determine whether a particular sentence is "just." A punishment is "just" insofar as it "fit[s] the crime," *Wilson,* 350 F.Supp.2d at 916, and "reflect[s] the gravity of the defendant's conduct." *Id.* (quoting S. Rep. 98–225, 1984 U.S.C.C.A.N. 3182, 3258–59). It also "requires the court to consider society's views as to appropriate penalties, not just a judge's own personal instincts."[7] A "just punishment" must also take into account the cost of the defendant's criminal conduct and the cost society must undertake to punish for the offense. *United States v. Zakhor,* 58 F.3d 464, 466 (9th Cir.1995).

Simon's sentencing Guidelines would call for imprisonment between 324 and 405 months.[8] Simon's Guidelines have been predominantly determined by the weight of crack found during the search of his home. Had Simon been arrested with an equivalent amount of powder cocaine, the range would be a mere 108 to 135 months and he would, in all likelihood, be free. Simon contended that the discrepancy between sentences imposed for cocaine powder and crack offenses was unjust, out of proportion to the relative seriousness of crack offenses, and produced a disparate impact on black defendants. The disparity between sentences imposed for equivalent amounts of powder versus crack cocaine is now approaching common knowledge, and a source of popular and scholarly concern.[9]

7. *Id.* at 917; PETER H. ROSSI & RICHARD A. BERK, UNITED STATES SENTENCING COMMISSION, PUBLIC OPINION ON SENTENCING FEDERAL CRIMES 6 (1995) (stating that a "just" sentence should be "positively correlated with the punishment desired by the citizens"), *available at* http://www.ussc.gov/nss/jp_exsum.htm.

8. I adhere to my earlier ruling that the presentence report should increase Simon's offense by only one level for obstruction of justice and that the two-level adjustment of

the offense level for possession of a weapon should remain. Other objections to the PSR have been disposed of on the record in open court at the time of sentence.

9. *See, e.g., United States v. Then,* 56 F.3d 464, 467 (2d Cir.1995) (Calabresi, J., concurring); *United States v. Clary,* 846 F.Supp. 768 (E.D.Mo.1994), *rev'd* 34 F.3d 709 (8th Cir. 1994); Kevin J. Cloherty & Dawn M. Perlman, *Powder vs. Crack;* FED. LAW., March/ April 2003, at 50; Richard Dvorak, *Cracking the Code,* 5 MICH. J. RACE & L. 611 (2000);

■ Since *Booker*, a number of courts have accepted the· argument that in cases involving crack, they should consider non-Guidelines sentences.[10] Simon contended that in light of these cases and the general criticism of the disparity between crack and cocaine powder sentences, this Court should grant a non-Guidelines sentence.

### Origin and History of the Crack Guidelines

Prior to *Booker*, the sentencing structure for ·cocaine offenses was a result of the Anti–Drug Abuse Act of 1985. Pub.L. No. 99–570, 100 Stat. 3207 (1986). The Act created mandatory minimum sentences for trafficking in various controlled substances. *See* 21 U.S.C. § 841(b). In addition, it introduced what has come to be known as the "100–to–1" quantity ratio between powder cocaine and crack. To trigger the Act's ten-year mandatory minimum sentence, the offense had to either involve five kilograms of powder cocaine, or a mere 50 grams of crack.

The Act was moved through Congress with little discussion.· *Clary*, 846 F.Supp. at 784. Generally, bills are referred to subcommittee, hearings are held, comment is invited from the Administration, the Judicial Conference, and public· groups with relevant expertise, a markup is held, and amendments are offered. For this bill, the process was substantially streamlined and "[t]he careful deliberative practices of the Congress were set aside." Spade, *supra* at 1250. The Senate conducted only a single hearing on the 100:1 ratio, which lasted less than four hours.[11] No committee report was produced, and the discussion and legislative history on the Act is therefore sparse. Spade, *supra* at 1252.

In 1987, the Sentencing Commission adopted the 100–to–1 ratio in developing Guidelines for drug offenses. Using the mandatory minimum, the Commission proceeded to set proportionate sentences for the entire range of cocaine and crack quantities.[12] Offenses involving five grams of .crack were given the same Guidelines base offense level as offenses involving 500 grams of cocaine powder.

Congress revisited the issue in the Anti–Drug Abuse Act of 1988. Pub.L. No. 100–690, 102 Stat. 4181 (1988). The 1988 Act created a mandatory minimum penalty of five years for simple possession of five grams or more· of crack. By contrast, simple possession of any amount of powder cocaine by a first-time offender was punishable by a· maximum of one year in prison. *See* 21 U.S.C. § 844.

William Spade, *Beyond the 100:1 Ratio*, 38 ARIZ. L. REV. 1233 (1995); Jesseca R.F. Grassly, Comment, *Federal Cocaine Sentencing Following the 1995 Cocaine Report*, 21 HAMLINE L. REV. 347 (1998).

**10.** *See, e.g., United States· v. Smith*, 359 F.Supp.2d 771 (E.D.Wis.2005) (granting below Guidelines sentence to defendant convicted of crack offense); *United States v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb.22, 2005) (same); *United States v. Nellum*, 2:04–CR–30, 2005 WL 300073, at *3 (N.D.In. Feb.3, 2005) (same); *see also* SENTENCING COMMISSION, NUMBERS ON POST-*BOOKER* SENTENCINGS (March 3, 2005), *available at* http://www.ussc.gov/Blakely/book-

er_030305.pdf (reporting that 1.1% of post-*Booker* sentences are non-Guideline sentences above Guideline range, and 8.3% are non-Guideline sentences below Guideline range).

**11.** *Id.* at 1253; *"Crack" cocaine: Hearing Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate*, 99th Cong., 2d Sess. 20 (1986).

**12.** U.S. SENTENCING COMM'N, SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 10 (2002) [hereinafter "2002 REPORT"], *available at* http://www.ussc.gov/legist.htm.

*Sentencing Commission Recommendations*

The concern and criticism these sentencing disparities created prompted Congress to enact the Violent Crime Control and Law Enforcement Act of 1994, which directed the Sentencing Commission to create a report "on issues relating to sentences applicable to offenses involving the possession or distribution of all forms of cocaine." Pub.L. No. 103–322, § 280006, 108 Stat. 2097 (1994). The Act specifically directed the Commission to consider "the differences in penalty levels that apply to different forms of cocaine." *Id.*

The resulting report, issued in 1995, strongly recommended that the 100:1 ratio be reduced.[13] The Commission concluded that some unequal ratio between powder and crack cocaine was necessary to reflect the different harms associated with the two forms of the drug. *Id.* at 199. The Commission stated its intent to submit "one or more penalty scheme models" in the near future. *Id.* at 200.

On May 11, 1995, the Commission presented to Congress several amendments to the Guidelines. 60 Fed.Reg. 25,074 (1995). The Commission unanimously agreed that the 100:1 ratio was too great, and a majority recommended instead adopting a 1:1 equivalence between crack and powder cocaine. 60 Fed.Reg. 25077. The greater harms associated with the crack form of the drug were already accounted for by enhancements for the sale of controlled substances to juveniles and pregnant women, § 2D1.2, offenses involving death or serious bodily harm, § 2D1.1, or the use of juveniles to sell the drug, § 2D1.2. 60 Fed. Reg. 25076.

Congress ultimately rejected the amendment. But recognizing the need for change, it directed the Commission to make further recommendations regarding cocaine sentencing. *See* Pub.L. No. 104–38, § 2(a)(1)(A), 109 Stat. 334 (1995). In its subsequent recommendations, the Commission was directed to maintain stiffer sentences for crack offenses than cocaine, though it was free to recommend a less severe ratio. *Id.*

In 1997, the Commission issued another proposal, again stating that a 100:1 ratio was unjustifiable.[14] It recommended altering the quantity threshold for triggering mandatory minimum sentences for both powder and crack cocaine to reflect a 5:1 ratio. *Id.* Shortly after, on July 3, 1997, the Attorney General and Drug Czar McCaffrey recommended adopting a similar 5:1 ratio.[15] On July 22, 1997, the Clinton administration publicly proposed reducing the ratio to 10:1. *Id.* However, no bill was introduced to implement any of these solutions and no formal amendment to the Guidelines was proposed.

Finally, in 2002, the Commission again unanimously declared the 100–to–1 ratio was "unjustified." 2002 REPORT at 91. The Commission also declared that the ratio "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act." *Id.* The Commission believed that sentencing proportionality could be better achieved by eliminating the mechanical ratio and instead apply specific enhancements "to target the minority of offenders

---

13. U.S. SENTENCING COMM'N, SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 198 (1995) [hereinafter "1995 REPORT"], *available at* http://www.ussc.gov/legist.htm.

14. U.S. SENTENCING COMM'N, SPECIAL REPORT TO THE CONGRESS: COCAINE

AND FEDERAL SENTENCING POLICY 2 (1997) [hereinafter "1997 REPORT"], *available at* http://www.ussc.gov/legist.htm.

15. Elizabeth Tison, *Amending the Sentencing Guidelines for Cocaine Offenses*, 27 S. ILL. U.L.J. 413, 429 (2003).

who engage in the most harmful conduct that concerned Congress." *Id.* at 91–92. The current focus on a ratio to account for the additional dangers crack posed meant that "*all* crack cocaine offenders would be punished *as if* they engaged in certain more harmful conduct, even though sentencing data demonstrates that the overwhelming majority of federal crack cocaine offenders are not involved in such conduct." *Id.* at 92. The "intrinsic harms posed by the two drugs (e.g., addictiveness)" and crack's heightened association with systemic crime did, however, justify some degree of difference in base offense levels, which could be reflected in a less severe ratio. *Id.* at 93, 100. Although the Commission did not propose Guideline amendments, the 2002 report effectively recommended reducing crack sentences to reflect a 20:1 ratio with powder cocaine. *Smith*, 359 F.Supp.2d 771; *see* 2002 REPORT at 106.

At oral argument, Simon contended that the Court could resentence him employing a ratio other than that employed by the Guidelines. Certainly the history of crack and powder cocaine reform efforts offers a variety of options and sentences to choose from.[16] Employing the 100:1 ratio that the Guidelines recommend produces a base offense level of 36. After factoring in the obstruction of justice and gun enhancement and Simon's criminal history, the recommended sentence is 324 to 405 months. If the Court were to employ either the 20:1 ratio most recently recommended by the Commission or the 10:1 ratio recommended by the Clinton administration, Simon's base offense level would be 32, ultimately resulting in a sentence of 210 to 262 months. The Commission's 1997 recommendation of 5:1 produces a base offense level of 28, and a sentence of 135 to 168 months. Finally, the Commission's 1995 recommendation of a 1:1 equivalency results in a base offense level of 26, and a sentence of 108 to 135 months.

Post-*Booker*, none of these sentences is strictly mandatory. *See Smith*, 359 F.Supp.2d 771 (granting a non-Guideline sentence in part due to the unfairness of the 100:1 ratio); *Biheiri*, 356 F.Supp.2d at 594 n. 7 (noting that a judge could "conceivably" grant a non-Guideline sentence because of the severity of the crack Guidelines); *Nellum*, 2005 WL 300073, at *4 (considering granting a non-Guideline sentence due to Commission's recommendations but granting a non-Guideline sentence on other grounds). It is, however, not for this Court to adopt a specific ratio, but instead to craft a sentence that is reasonable and best satisfies the requirements of § 3553(a). In doing so, I rely in part on the research of the Commission and other sources, whose expertise in these matters is entitled to some deference. Although I decline to follow the Guidelines' 100:1 ratio, I nonetheless will follow the Guidelines in treating an offense involving crack more seriously than a similar offense involving powder cocaine, if only because of its relatively high level of addictiveness and the fact that the burden imposed by crack trafficking falls disproportionately on some of the most vulnerable in our community. *See* 1995 REPORT at 35 (reporting that crack users are disproportionately poor and minorities).

### Justice, the Guidelines Sentence, and Public Opinion

Proponents of the Guidelines have argued that they provide just sentences because they generally track public opinion.[17]

---

16. For discussion of other ratios, see Spade, *supra* at 1284–89 (discussing various proposals and advocating a 20:1 ratio).

17. *See Wilson*, 350 F.Supp.2d at 917 (citing PETER ROSSI & RICHARD BERK, JUST PUNISHMENTS: FEDERAL GUIDELINES AND PUBLIC VIEWS COMPARED (1997));

One of the few areas where the Guidelines substantially deviate from the public's views, however, is with respect to the harsh difference in treatment between crack and other drugs.[18] A public opinion study sponsored by the Commission revealed that when asked to provide sentences for criminals convicted for trafficking in various drugs, the public chooses about the same median sentence for crack, heroin, and powder cocaine. *See* ROSSI & BERK, *supra* note 6, at 83. In sum "the type of drug being sold is just not very important" to the public. *Id.* Where such a deviation between the Guidelines and public opinion exists, the reasonableness of the sentence they recommend diminishes. *Cf. Wilson*, 350 F.Supp.2d at 917 (arguing that the Guidelines should be given great weight because they closely track public opinion).

### Justice and Finality Considerations

■ Finally, I note that the Guidelines do not take into account the unusual procedural history of this case and personal situation of Mr. Simon, which counsels toward providing a more lenient sentence. Simon was originally improperly convicted of using a firearm in connection with a drug trafficking crime in violation of § 924(c). His motion to remedy this error was then improperly converted from a § 3582 motion to a § 2241 petition. This resulted in a first round of resentencing, which was then appealed and vacated due to the improper conversion. Simon now faces his third sentencing for the same conviction. For the entire fifteen years of his incarceration, Simon has not had a

correct and final sentence. This lack of finality takes its toll on defendants, just as it does on the public and the courts.

I conclude that in this case, considerations related to the seriousness of the offense, respect for the law, and just punishment counsel a more lenient sentence than the Guidelines recommend.

### § 3553(a)(2)(B); General Deterrence

Section 3553(a)(2)(B) instructs the Court to consider whether the sentence recommended by the Guidelines provides adequate deterrence to criminal conduct. The resulting recommended sentence of 324 to 405 months is indisputably severe. But a longer sentence will almost always provide greater general deterrence. When considering this factor, therefore, a court must pay particular attention that the sentence imposed is not impermissibly "greater than necessary." *See* § 3553(a) (stating that a sentence may not be greater than necessary to comply with the purposes of punishment). A determination of what punishment provides "adequate deterrence" requires consideration of how strongly the conduct must be deterred, which is itself a product of the harm it produces.

The Commission's most recent report finds that the Guidelines' recommended sentences for crack "exaggerate[ ] the relative harmfulness of crack cocaine." 2002 REPORT at 93. Many of the assumptions that underlay the Commission's original crack and powder cocaine Guidelines have not held up after further research. Although the Commission has found that

---

Paul G. Cassell, *Too Severe?*, 56 STAN. L. REV. 1017, 1029 (2004) (describing crack sentencing as an exception to the Guidelines' consistency with public opinion). A summary of Rossi and Berk's findings is available at 12 FED. SENT. REP. 27 (1999) (reporting that for crack trafficking, "the sentences desired by the public were much lower than the

Guidelines"). Their report to the Commission is available at http://www.ussc.gov/nss/jp_exsum.htm.

**18.** *Wilson*, 350 F.Supp.2d at 917; Mary Pat Flaherty & Joan Biskupic, *Rules Often Impose Toughest Penalties on Poor*, WASH. POST. Oct. 9, 1996, at A1.

crack is more addictive than powder cocaine due to the different manner in which the two drugs are ingested, many of the harmful side effects are similar. For example, the Commission has concluded that the negative effects of prenatal exposure to the two drugs are identical, and less severe than originally believed. *Id.* at 93–94. The Commission also reports that powder cocaine use is two to seven times as high amongst juveniles as crack cocaine use. *Id.* at 96. Nor does youth play a major role in crack cocaine trafficking. Minors accounted for only 4.2% of federal crack cocaine offenses in 2000. *Id.* at 97

Finally, general deterrence, like the idea of a just sentence, should correlate with public opinion. For a punishment to deter, the public must view it as sufficiently severe as to offset the gains likely to be achieved from the commission of the crime. *See* ROSSI & BERK, *supra* note 6, at 7. And, as previously noted, the public views the recommended Guidelines sentence in this case as peculiarly lengthy.

It is indisputable, however, that Congress has concluded that sentences for crack-related offenses are to be lengthy, and in particular more lengthy than similar powder cocaine offenses. The Commission has concurred due to the intrinsic differences between the two forms of the drug. *Id.* at 92. I therefore concluded that general deterrence demands a sentence that is both lengthy, and in excess of what Simon would receive had his offense involved powder cocaine. A sentence of 262 months meets both of these qualifications and provides substantial and appropriate deterrence to those contemplating this offense.

### § 3553(a)(2)(C): Specific Deterrence

Section 3553(a)(2)(C) requires the Court to consider the need to protect the public from future crimes of this particular defendant. Simon is currently 43 years-old. He will be approximately fifty when re-leased, having served a sentence in excess of twenty years. Under the Guidelines, age was not normally relevant to sentencing. § 5H1.1. Post-*Booker*, however, at least one Court has noted that recidivism drops substantially with age. *Nellum*, 2005 WL 300073 (granting non-Guideline sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of defendants under the age of 21). The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant. I therefore conclude that a sentence of 262 months provides sufficient, but not excessive, deterrence for this defendant.

### § 3553(a)(2)(D): Provision of Training, Medical Care and Correctional Treatment

Section 3553(a)(2)(D) requires the Court to consider the need for training, medical care, and correctional treatment. Rehabilitation and the improvement of the defendant are therefore goals of sentencing. As one post-*Booker* sentencing court has noted, rehabilitation "cannot be served if a defendant can look forward to nothing beyond imprisonment." *Carvajal*, 2005 WL 476125 (imposing non-Guideline sentence to defendant convicted of conspiring to distribute crack). It is doubtful whether a sentence of 324 to 405 months provides such hope.

### § 3553(a)(6): Sentencing Disparity

Avoidance of disparity is of particular importance in a case in which the court imposes a non-Guidelines sentence. Whatever other faults they had, the mandatory sentencing Guidelines achieve a remarkable measure of sentencing uniformity. For this reason alone, quite apart from the separate mandate that the sentencing Guidelines be considered, it is appropriate to consider the Guidelines sentences that

would be imposed if ratios other than the 100:1 ratio between crack and powder cocaine were employed. As already noted, employing either the 10:1 or 20:1 ratios recommended by the Clinton administration and the Sentencing Commission would result in a Guideline range of sentences between 210 and 262 months. Within this range, a sentence below the high end would create a serious disparity between the sentences imposed on Simon's co-defendant for participation in the same offense.

### Statement of Reasons for Imposition of the Particular Sentence

■ As noted above, the recommended Guidelines sentencing range of 324 to 405 months substantially overstates the seriousness of the offense, particularly when compared with offenses involving comparable quantities of powder cocaine. Imposition of a sentence within that range would create unjust sentencing disparities and deterrence greater than that necessary to protect the public. In addition, a sentence within the Guidelines range would not give appropriate consideration to defendant's medical condition, his age at the time of release, and the amount of time he has lived with a lack of finality as to the length of time he would have to serve in prison. The particular sentence of 262 months is imposed because it is within, albeit at the top of, the range of sentences that would exist if either a 10:1 or 20:1 ratio of crack to powder cocaine were adopted and avoids disparity with the sentence imposed on Simon's co-defendant. Avoidance of such disparity is appropriate because both Simon and his co-defendant engaged in the same criminal conduct.[19] While Simon's personal characteristics, including his misconduct as a prisoner, absence of rehabilitation, and a higher criminal history category, might warrant a more serious sentence for him than for his co-defendant, significant mitigating factors exist in Simon's case which did not exist in that of his co-defendant, in particular Simon's medical condition, and the long delay in achieving finality. For all of these reasons, I have determined that a sentence of 262 months is appropriate. A five-year period of supervised release as provided for in 21 U.S.C. § 841(b)(1)(A) bolsters the protection of the public in view Simon's disciplinary record while in prison.

### Conclusion

For the foregoing reasons, after consideration of the factors as set forth in § 3553(a), I sentenced Simon to 262 months imprisonment to be followed by five years supervised release.

The Clerk is directed to furnish a filed copy of the within to all parties.

SO ORDERED.

---

**19.** The co-defendant's offense level was, of course, determined based on a 100:1 ratio between powder and crack cocaine. However, it also included adjustments for possession of a gun and obstruction of justice. His criminal history category was I.