PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

VINCENT CARNELIUS EURA,
    *Defendant-Appellant.*

No. 05-4437

UNITED STATES OF AMERICA,
    *Plaintiff-Appellant,*

v.

VINCENT CARNELIUS EURA,
    *Defendant-Appellee.*

No. 05-4533

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-04-151)

Argued: December 2, 2005

Decided: February 24, 2006

Before WILKINSON and MICHAEL, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed in part, vacated in part, and remanded by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Wilkinson joined. Judge Michael wrote a separate opinion concurring in the judgment and concurring in part.

---

**COUNSEL**

**ARGUED:** Craig Weston Sampson, Richmond, Virginia, for Appellant/Cross-Appellee. Michael James Elston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee/Cross-Appellant. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee/Cross-Appellant.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

Under the United States Sentencing Guidelines, a defendant who deals five grams of crack cocaine faces the same sentence as a defendant who deals five hundred grams of powder cocaine. This disparity is commonly referred to as the "100:1 ratio." Congress adopted the 100:1 crack cocaine/powder cocaine ratio in 1986, thereby setting mandatory minimum sentences based on the quantity of cocaine, in crack or powder form.[1] In 1987, the Sentencing Commission, following Congress' lead, adopted the same ratio, when it fashioned the Drug Quantity Table found at USSG § 2D1.1(c). Under the Guidelines, the Drug Quantity Table determines a defendant's offense level, which ultimately controls the sentencing range under the Guidelines.

---

[1]Congress adopted the 100:1 ratio in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, when it created minimum and maximum terms of imprisonment for defendants convicted of trafficking in powder cocaine and crack cocaine. For example, 21 U.S.C. § 841(b)(1)(A) sets a mandatory minimum ten year sentence for those who possess or distribute more than five kilograms of powder cocaine and for those who possess or distribute more than fifty grams of crack cocaine. *See also* USSG § 2D1.1(c)(4) (which treats the possession of fifty grams of crack cocaine the same as it treats the possession of five kilograms of powder cocaine). Moreover, § 841(b)(1)(B) sets a mandatory minimum five year sentence for those who possess or distribute more than five hundred grams of powder cocaine and for those who possess or distribute more than five grams of crack cocaine.

In 1995, 1997, and most recently in 2002, Congress declined to entertain the Commission's entreaties to narrow the ratio.

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory Guidelines scheme providing for sentence enhancements based on facts found by the sentencing court violated the Sixth Amendment. *Id.* at 755-56 (Stevens, J., opinion for the Court). The Court remedied the constitutional violation by severing and excising the statutory provisions which mandated sentencing and appellate review under the Guidelines, thus making the Guidelines advisory. *Id.* at 756-57 (Breyer, J., opinion for the Court).

The principal question presented in this appeal is whether a district court in the post-*Booker* world can vary from the advisory sentencing range under the Guidelines by substituting its own crack cocaine/powder cocaine ratio for the 100:1 crack cocaine/powder cocaine ratio chosen by Congress. For the reasons stated below, we conclude a court cannot vary from the sentencing range in such a manner.

I

A

On May 3, 2004, agents of the Drug Enforcement Administration (DEA) applied for and obtained a search warrant for 353 Riverside Manor Boulevard in Fredericksburg, Virginia. The search warrant application in large part was based on information provided by a cooperating source. The source, whose information had led to the arrest of at least one other drug trafficker, told the agents that he had been buying crack cocaine from Vincent Eura since 1996 and had purchased crack cocaine from him as recently as March 2004.[2] Most of these purchases had occurred at Eura's residence. In a recorded telephone conversation on May 3, 2004, the source asked Eura if he had any crack cocaine and Eura responded that he was "straight." (J.A. 28). According to the source, Eura had used the term "straight" in the past to indicate that he had crack cocaine to sell. (J.A. 28). In

---

[2]According to the search warrant application, Eura was a "known source of crack cocaine in the Fredericksburg area." (J.A. 28).

a later conversation, the source and Eura arranged to meet that evening at Eura's residence.

Rather than allowing the source to buy crack cocaine from Eura, the DEA agents obtained and executed a search warrant for Eura's home. The search occurred at approximately 9:30 p.m. on May 3, 2004. During the search, Eura was detained and placed in handcuffs for officer safety.

The search of Eura's home yielded several automatic weapons but no drugs. Eura told the agents that the weapons were his. An unidentified woman at the residence told the DEA agents that a BMW and a Mitsubishi Diamante parked on the street belonged to Eura. A license plate check with the Virginia Department of Motor Vehicles (DMV) verified that the two automobiles were registered to Eura.

Special Agent William Harding testified that he spoke with Eura about the automobiles and asked for consent to search them. Eura refused. Agent Harding then asked a local K-9 unit to walk around the two automobiles.

A drug detection dog alerted to Eura's Mitsubishi Diamante, indicating the presence of drugs. The DEA agents then opened the automobile and the dog alerted to the center console area. With the help of the dog, the agents recovered eleven grams of crack cocaine and 26.6 grams of MDA (ecstacy) from the center console armrest. A further search of the automobile resulted in the discovery of a loaded firearm in the glove compartment.

B

On July 19, 2004, Eura was charged in a three-count second superseding indictment with conspiring to possess with intent to distribute fifty grams or more of crack cocaine, 21 U.S.C. §§ 841(b)(1)(A) and 846 (Count One), possession with intent to distribute five grams or more of crack cocaine, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count Two), and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c) (Count Three).

Prior to trial, Eura moved to suppress the evidence obtained during the warrantless search of his Mitsubishi Diamante. The district court denied the motion.

Following a trial, Eura was convicted on Counts Two and Three, but acquitted on Count One. The jury found that Eura's conviction on Count Two involved between five and twenty grams of crack cocaine. On April 15, 2005, he was sentenced to 120 months' imprisonment, consisting of a sixty-month sentence on Count Two and a sixty-month consecutive sentence on Count Three. Eura noted a timely appeal, challenging his convictions. The government filed a timely cross-appeal, challenging Eura's sentence.

II

In his appeal, Eura contends that the warrantless search of his Mitsubishi Diamante violated his rights guaranteed by the Fourth Amendment. More specifically, Eura contends that, while the search of his home was permissible pursuant to the search warrant, once the DEA agents found no drugs in his home, the subsequent K-9 sniff of his automobiles was not permissible under the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A K-9 sniff is not a search within the meaning of the Fourth Amendment and, thus, neither probable cause nor a warrant is required. *United States v. Place*, 462 U.S. 696, 706-07 (1983). However, "[r]easonable suspicion" is required for the temporary seizure of the vehicle and any occupants that are necessary to facilitate a K-9 sniff of the exterior of a vehicle. *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

The standard of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails common sense, nontechnical conceptions that deal with factual and practical considerations of everyday life on which reasonable and prudent persons, not legal technicians, act." *Id.* The reasonable suspicion standard, like the probable cause standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed. *Id.*

The reasonable suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, under the reasonable suspicion standard, "a minimal level of objective justification" for the police action is required. *Id.*

According to Eura, once the DEA agents failed to discover drugs in his home, the only reasonable conclusions were that the confidential source was unreliable and that Eura was not a drug dealer, and, consequently, the agents were required under the Fourth Amendment to leave him "in peace." Appellant's Br. at 9.

Eura's argument founders for the simple reason that the absence of drugs in his home is of little significance in the reasonable suspicion analysis. On the one hand, the presence of drugs in Eura's home certainly would have provided a reasonable basis for the DEA agents to believe that further evidence of drug dealing would be found in Eura's automobiles. Common sense tells us that drug dealers often transport drugs and other items related to drug trafficking in automobiles, as do other innumerable cases in which drug dealers have been caught transporting drugs in automobiles. Thus, the presence of drugs in Eura's home would have provided a basis to order the K-9 sniff of the BMW and the Mitsubishi Diamante. On the other hand, the agents' failure to find drugs in Eura's home understandably meant little, if anything, to the agents. The recorded phone conversations and other relevant evidence made it clear that a drug transaction at the home was imminent, making the presence of drugs in a nearby place under Eura's control likely. Consequently, the agents' failure to find drugs in Eura's home did not prevent the agents from ordering the K-9 sniff of the automobiles.

We are not suggesting that a search of a home for drugs pursuant to a search warrant necessarily permits a K-9 sniff of the home occupant's automobiles. We are holding only that the following facts provided reasonable suspicion for the K-9 sniff in this case: (1) a confidential source informed the DEA agents he had been buying crack cocaine from Eura since 1996; (2) the source was knowledgeable about the ways of drug dealing and had provided information on a prior occasion that resulted in the arrest of a drug dealer; (3) Eura

was known to the Fredericksburg Police Department Narcotics Unit as a dealer of crack cocaine in the Fredericksburg area; (4) the source, in a recorded phone conversation monitored by law enforcement, ordered crack cocaine from Eura who indicated he was "straight," (J.A. 28), which, according to the source, meant he had crack cocaine to sell; (5) the source and Eura agreed to meet at Eura's residence on May 3, 2004; (6) a search of Eura's residence that evening pursuant to a search warrant yielded no drugs but did result in the discovery of several firearms Eura claimed to own; (7) a woman residing with Eura informed the agents that Eura had two automobiles parked outside, a BMW and a Mitsubishi Diamante; and (8) a license plate check with the DMV confirmed that the automobiles were registered to Eura.[3]

Because there was reasonable suspicion to support the K-9 sniff, the DEA agents had probable cause to search Eura's Mitsubishi Diamante once the drug detection dog alerted. *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994) (holding that a drug detection dog alert on an automobile gives rise to probable cause to search the automobile). Accordingly, the district court properly denied Eura's motion to suppress the evidence seized from his Mitsubishi Diamante.

### III

On cross-appeal, the government challenges Eura's sentence. Before addressing the government's argument, we take time to set forth the relevant facts concerning the manner in which Eura was sentenced.

In his Presentence Investigation Report, the probation officer concluded that Eura's offense level on Count Two was 28, resulting in

---

[3]We also note that the absence of drugs in Eura's residence did not require the district court to disregard all of the information obtained by the DEA agents that led to the search of the residence. *See Foreman*, 369 F.3d at 783 (holding that the termination of a traffic stop does not negate the objectively reasonable suspicions developed by a police officer during a traffic stop and, therefore, court should examine all of the circumstances surrounding the defendant's encounter with the officer in determining whether there was reasonable suspicion for a K-9 sniff).

a sentencing range of 78 to 97 months' imprisonment.[4] At the sentencing hearing on April 15, 2005, the district court noted that the sentencing range for Count Two under the Guidelines was 78 to 97 months. The court further noted that there was a sixty-month mandatory minimum sentence on Count Two and a mandatory sixty-month consecutive sentence on Count Three.

The court then noted that Eura's sentence needed to "reflect the seriousness of the offense, to promote respect for law and to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and provide the defendant with any corrective treatment." (J.A. 328). The court also noted that it must consider pertinent policy statements by the Sentencing Commission. The court summarized the Commission's 1995, 1997, and 2002 reports, all of which recommended that the 100:1 ratio be narrowed.[5] According to the court, it was required to

---

[4]The probation officer noted that the jury found that Eura's offense involved between five and twenty grams of crack cocaine, which produced a base offense level of 26. Eura's offense level was raised two levels for obstruction of justice. The probation officer also noted that Eura's criminal history category was I.

[5]For over a decade, the Sentencing Commission has urged an overhaul of the law concerning sentences in crack cocaine and powder cocaine cases. In 1995, the Commission submitted to Congress a proposed amendment to the Sentencing Guidelines that would have equalized the penalties for crack cocaine and powder cocaine. *See United States v. Perry*, 389 F. Supp.2d 278, 301 (D.R.I. 2005) (discussing 1995 proposed amendment). Congress, however, passed, and the President signed, legislation disapproving the proposed amendment. *See id.* In a 1997 report, the Commission essentially recommended a 5:1 ratio, to which Congress took no action. *See id.* (discussing 1997 report). In 2002, the Commission once again issued a report, this time recommending what amounted to a ratio of 20:1. *See id.* at 302 (discussing 2002 report). Again, Congress took no action. The 2002 report emphasized, among other things, that: (1) the feared epidemic of crack cocaine never materialized in the way it was envisioned by Congress at the time of the passage of the 100:1 ratio; (2) the current penalties for crack cocaine offenders sweep too broadly and apply too frequently to low level offenders, resulting in a seemingly unintended "penalty gap" between high level and low level offenders; (3) the 100:1 ratio overstated the seriousness of most crack cocaine offenses and failed to provide adequate proportionality; and (4) the 100:1 ratio disparately impacted minorities, especially blacks. *See id.* (discussing the Commission's findings in the 2002 report).

consider these reports in "assessing whether the punishment—whether the sentence promotes respect for law, provides just punishment, is necessary to provide a deterrence and to protect the public and is also reflective of the seriousness of the offense." (J.A. 334). The court found that, in view of the Commission's reports, a sentence within the sentencing range suggested by the Guidelines would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment in this case. The court went on to state:

> Considering all the factors, the Court finds in the case of Mr. Eura—and I think it is appropriate to note that it is appropriate to consider this matter as an individual matter, not as a wholesale objection or acceptance of the guidelines.
>
> In this instance, this is the kind of case that having considered the Sentencing Commission's policies recommendations, it is the kind of case that the guideline does not provide—the crack guideline does not provide an appropriate, fair and just punishment, and so the Court will not impose a sentence within the guidelines in this case.

(J.A. 335-36). Following these remarks, the court declined to sentence Eura on Count Two within the advisory sentencing range of 78 to 97 months. Rather, the court sentenced Eura to sixty months on Count Two, which was the lowest possible sentence on Count Two, given the mandatory minimum sentence required for that count.[6] The court

---

[6]As noted earlier, the jury found Eura's Count Two offense involved between five and twenty grams of crack cocaine. At a 20:1 ratio, the ratio recommended by the Sentencing Commission's 2002 report, base offense levels 18, 20, and 22 come into play, instead of offense level 26. Using the eleven grams of crack cocaine found in the Mitsubishi Diamante, the district court concluded that, had the Commission's 2002 recommendation been adopted by Congress, Eura's base offense level would have been 20 (eleven grams of crack cocaine produces 220 grams of powder cocaine under a 20:1 ratio). Adding a two-level enhancement for obstruction of justice, Eura's offense level would have been 22 under the Commission's 2002 report and would have yielded a sentencing range of 41 to 51 months. Given the statutory minimum on Count Two, the court could not sentence Eura within that range and, as a result, sentenced Eura to the statutory minimum for that count.

also imposed the mandatory consecutive sixty-month sentence on Count Three. In imposing sentence, the court indicated that it acted "[p]ursuant to 18 U.S.C. Section 3553(a)," that it had "considered the guidelines as advisory," and that the chosen sentence "satisfie[d] the prerequisites of Section 3553(a)." (J.A. 337).

On appeal, the government contends that the sentence imposed on Eura was unreasonable because it was based on the district court's disagreement with the policy decisions of Congress regarding the appropriate punishment for crack cocaine dealers. According to the government, the sentence imposed by the court does not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense. Moreover, the government posits that the sentence in this case unquestionably will lead to sentencing disparities.

After *Booker*, sentencing requires two steps. First, the district court must consult the Sentencing Guidelines and correctly calculate the range provided by the Guidelines. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Second, the court must consider this sentencing range along with the other factors described in 18 U.S.C. § 3553(a) and then impose a sentence. *Hughes*, 401 F.3d at 546.[7] If a sentence within the sentencing range serves the factors set forth in § 3553(a), the court should impose a sentence within that range that best serves those factors. *United States v. Green*, No. 05-4270, 2006 WL 267217, at *4 (4th Cir. February 6, 2006). If a sentence within the sentencing range does not serve the § 3553(a) factors, the court may impose a sentence outside of the sentencing range, provided it explains "why a sentence outside of the Sentencing Guideline range

---

[7]The other factors in § 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) pertinent policy statements of the Sentencing Commission; (8) the need to avoid unwarranted sentencing disparities; and (9) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

better serves the relevant purposes set forth in § 3553(a)." *Green*, 2006 WL 267217, at *4.

In determining whether a sentence is reasonable on appeal, we are guided by the factors in 18 U.S.C. § 3553(a). *Booker*, 125 S. Ct. at 765-66. To establish the reasonableness of a sentence, a district court need not explicitly discuss every § 3553(a) factor on the record. *See United States v. Rines*, 419 F.3d 1104, 1107 (10th Cir. 2005) (noting that, in a case where the district court imposed an identical discretionary sentence, "[i]t is true that the district court did not march through § 3553(a)'s sentencing factors, but we have never imposed such a requirement"); *United States v. Dean*, 414 F.3d 725, 728 (7th Cir. 2005) (rejecting the contention that "it is the duty of the sentencing judge, in every case and whether or not the defendant invokes any of the factors mentioned in section 3553(a), to make an explicit, articulated analysis of all of them a part of the sentencing process"). Rather, the record must reflect that the court adequately and properly considered the § 3553(a) sentencing factors. *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005).

In this case, we are of the opinion that the district court did not adequately and properly consider 18 U.S.C. § 3553(a)(6) in sentencing Eura. Had the court done so, it most assuredly would have concluded that it could not rely on the Sentencing Commission's recommendations to narrow the 100:1 ratio in imposing sentence.

Section 3553(a)(6) requires the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." By its plain language, § 3553(a)(6) seeks to bring about increased uniformity in the sentencing of similarly situated defendants. However, giving a sentencing court the authority to sentence a defendant based on its view of an appropriate ratio between crack cocaine and powder cocaine would inevitably result in an unwarranted disparity between similarly situated defendants in direct contradiction to the specific mandate of 18 U.S.C. § 3553(a)(6). *Cf. In re Sealed Case*, 292 F.3d 913, 915 (D.C. Cir. 2002) (rejecting departures based on crack cocaine/powder cocaine disparity and stating that it is "hard to imagine a more flagrant violation of the Guidelines' purpose, to avoid unwarranted sentencing disparities among defendants with similar

records who have been found guilty of similar criminal conduct") (citation and internal quotation marks omitted); *United States v. Fisher*, 58 F.3d 96, 99-100 (4th Cir. 1995) (rejecting due process and equal protection challenges to the 100:1 ratio).

To be sure, if left to use their own personal ratio preferences, we envision that some sentencing courts will attempt to equalize sentencing for crack cocaine and powder cocaine offenses by reducing crack cocaine sentences to the level of powder cocaine sentences; others might raise powder cocaine sentences to the level of crack cocaine sentences. Other courts will experiment with various ratios that they might consider fair and just. *See, e.g.*, *United States v. Fisher*, No. S3 03 CR 1501 SAS, 2005 WL 2542916, at *6 (S.D.N.Y. October 11, 2005) ("Given the range in ratios proposed in the past, I conclude that a 10:1 ratio is sufficient to punish crack cocaine dealers more harshly than those who deal in powder cocaine."); *United States v. Leroy*, 373 F. Supp.2d 887, 896 (E.D. Wis. 2005) (using a 20:1 ratio). Some courts will continue to apply the 100:1 ratio. *See United States v. Tabor*, 365 F. Supp.2d 1052, 1060-62 (D.Neb. 2005) (rejecting notion that ratio other than the 100:1 ratio can be applied).

These scenarios tell us that sentencing courts should not be in the business of making legislative judgments concerning crack cocaine and powder cocaine. Congress has made a decision to treat crack cocaine dealers more severely than powder cocaine dealers. Congress has also decided to instruct sentencing courts to avoid disparate sentences for crack cocaine dealers. As much as one might sympathize with the district court's concern regarding the inequities of the 100:1 ratio as expressed by the Sentencing Commission in its reports, it simply would go against two explicit Congressional directives to allow sentencing courts to treat crack cocaine dealers on the same, or some different judicially-imposed, plane as powder cocaine dealers. Moreover, allowing sentencing courts to subvert Congress' clearly expressed will certainly does not promote respect for the law, provide just punishment for the offense of conviction, or result in a sentence reflective of the offense's seriousness as deemed by Congress.

Our decision today is supported by the First Circuit's recent decision in *United States v. Pho*, where the court addressed whether a district court could impose a sentence outside the advisory sentencing

range based on its categorical rejection of the 100:1 ratio. *See* 433 F.3d 53 (1st Cir. 2006). The *Pho* court held that a district court could not craft its own ratio as a substitute for the 100:1 ratio chosen by Congress. *Id.* at 64. The court reasoned that Congress' selection of the 100:1 ratio was a policy judgment made by Congress and that courts were bound by this judgment. *Id.* at 62-63. We wholeheartedly agree with the *Pho* court's conclusion that a "district court's categorical rejection of the 100:1 ratio impermissibly usurps Congress's judgment about the proper sentencing policy for cocaine offenses." *Id.* at 63.

Of course, it does not follow that *all* defendants convicted of crack cocaine offenses must receive a sentence within the advisory sentencing range. We certainly envision instances in which some of the § 3553(a) factors will warrant a variance from the advisory sentencing range in a crack cocaine case. However, a sentencing court must identify the *individual* aspects of the *defendant's case* that fit within the factors listed in 18 U.S.C. § 3553(a) and, in reliance on those findings, impose a non-Guidelines sentence that is reasonable. Moreover, in arriving at a reasonable sentence, the court simply must not rely on a factor that would result in a sentencing disparity that totally is at odds with the will of Congress. *Cf. United States v. Clark*, No. 05-4274, 2006 WL 60273 (4th Cir. January 12, 2006) (opinion of Luttig, J.) (noting that the consideration of state sentencing practices in sentencing a federal defendant for a 21 U.S.C. § 846 offense renders the defendant's sentence unreasonable in light of § 3553(a)(6)). The Sentencing Commission's recommendations to narrow the 100:1 ratio are such impermissible factors and, thus, cannot be used as a basis to vary from the advisory sentencing range.

In this case, while the district court was not required to discuss each § 3553(a) factor on the record, it was required to adequately and properly consider the factors. The court did enunciate some of the factors, but relied on the unfairness it perceived existed in the 100:1 ratio to vary Eura's sentence from the advisory sentencing range. The court never adequately and properly considered § 3553(a)(6). Moreover, the court understandably did not mention any facts concerning Eura as an individual that would have warranted a sentence outside the sentencing range, as none existed in the record. Indeed, the record reflects

that there is nothing atypical about Eura's case that warranted a sentence outside of the advisory sentencing range.

## IV

For the reasons stated herein, we affirm Eura's convictions, vacate his sentence, and remand his case for resentencing at the low end of the sentencing range (seventy-eight months) on Count Two and to a consecutive sixty-month sentence on Count Three.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

MICHAEL, Circuit Judge, concurring in the judgment and concurring in part:

I agree with the majority that the record reveals no fact about Vincent Eura as an individual that would warrant a sentence below the applicable guidelines range for his crack cocaine offense. For this reason, I concur in the judgment to vacate Eura's sentence and remand for resentencing at the low end of the range. I also concur in part II of the majority's opinion upholding the warrantless search of Eura's car.

I write separately to discuss the practical utility of the Sentencing Commission's reports criticizing the substantial disparity in punishment for crack and powder cocaine offenses (the "100:1 ratio" or "crack/powder disparity"). For over a decade the Commission has recommended narrowing the 100:1 ratio on the ground that it unjustifiably exaggerates the relative harmfulness of crack cocaine offenses, particularly in relation to powder cocaine offenses. *See, e.g.*, U.S. Sentencing Comm'n, Special Report to the Congress: Cocaine and Federal Sentencing Policy 10 (2002) (hereinafter "2002 Report"), *available at* http://www.ussc.gov/legist.htm. The Commission's reports supporting this recommendation rely on an impressive array of authority (empirical, academic, and otherwise). In some cases these reports can be useful to courts in analyzing the factors of 18 U.S.C. § 3553(a), particularly those enumerated in § 3553(a)(2)(A) and (B): the need for the sentence imposed "(A) to reflect the seriousness of

the offense, to promote respect for the law, . . . to provide just punishment for the offense," and "(B) to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). I recognize that the Commission's reports alone cannot justify a sentence outside the guidelines range, given the need articulated in § 3553(a)(6) to avoid unwarranted sentencing disparities among similarly situated defendants. I believe, however, that the reports can be used to support a below-guidelines sentence that takes into account the several case-specific factors in § 3553(a) and at the same time respects the single factor in § 3553(a)(6).

I.

A.

In 1995 the Sentencing Commission issued a report to Congress recommending that the 100:1 ratio between crack cocaine and powder cocaine penalties be reduced. U.S. Sentencing Comm'n, Special Report to the Congress: Cocaine and Federal Sentencing Policy 198 (1995), *available at* http://www.ussc.gov/legist.htm (hereinafter "1995 Report"). Shortly thereafter, the Commission submitted a proposed amendment to the Sentencing Guidelines that would have equalized the penalties for crack cocaine and powder cocaine. Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25,074, 25,077 (U.S. Sentencing Comm'n May 10, 1995) (notice). Congress rejected this proposal but, recognizing the need for reform, directed the Commission to make further recommendations on cocaine sentencing. Act of Oct. 30, 1995, Pub. L. No. 104-38, 109 Stat. 334. In 1997 the Commission issued another proposal urging Congress to overhaul the crack/powder penalty scheme by reducing the 100:1 ratio to a 5:1 ratio. U.S. Sentencing Comm'n, Special Report to the Congress: Cocaine and Federal Sentencing Policy 2 (1997), *available at* http://www.ussc.gov/legist.htm (hereinafter "1997 Report"). The Attorney General also recommended a 5:1 ratio while the White House publicly endorsed a 10:1 ratio. *See* Elizabeth Tison, *Amending the Sentencing Guidelines for Cocaine Offenses*, 27 S. Ill. U. L.J. 413, 427 (2003). Congress did not act on the Commission's proposal. Finally, in 2002 the Commission again unanimously declared the 100:1 ratio "unjustified" and urged reducing crack sen-

tences to reflect a 20:1 ratio. 2002 Report, *supra*, at 91, 106. Again, Congress did not act on the Commission's recommendation.

In making its 2002 recommendation, the Sentencing Commission reviewed scholarly articles, conducted extensive empirical and public opinion studies, and solicited public comment from a wide range of sources (including medical and scientific experts, federal and local law enforcement officials, criminal justice practitioners, academics, and civil rights activists). *See* 2002 Report, *supra*, at Appendix E. Based on this immense body of evidence, the Commission made four main findings. First, the 100:1 ratio exaggerates the relative harmfulness of crack cocaine, especially when its addictive qualities, risks of prenatal exposure, and use by juveniles are taken into account. *See id.* at v-vi. Cocaine in any form, whether as crack or powder, "produces the same physiological and psychotropic effects." *Id.* at v. The only difference is that powder cocaine is less addictive than crack cocaine because it is snorted, but this difference alone does not warrant the extreme differential in penalties. *See id.* Moreover, the "epidemic of crack use by youth never materialized to the extent feared." *Id.* at vi. In fact, use of crack cocaine among juveniles is lower than use of powder cocaine. *See id.* Second, the current penalties "sweep too broadly and apply most often to lower level offenders," resulting in a "penalty gap" that most acutely affects low-level crack offenders with the least criminal history. *Id.* at vi-vii. This penalty gap contravenes the basic principles of sentencing policy. *See id.* Third, the current penalties overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality, punishing "*all* crack cocaine offenders *as if* they committed [the] more harmful acts" associated with only *some* crack offenses (namely, acts of violence). *Id.* at vii. Fourth, the current penalties disproportionately target African-American defendants, spurring a perception of racial disparity that "fosters disrespect for and lack of confidence in the criminal justice system." *Id.* at vii-viii. This disparity, furthermore, introduces irrationality and "possibly harmful mischief" into the criminal justice system because it has little to do with culpability: all crack begins as powder cocaine and is transformed into crack through a "quick and uncomplicated operation," generally near the point of retail sale. *United States v. Smith*, 359 F. Supp. 2d 771, 780 (E.D. Wis. 2005) (detailing testimony and other evidence before Commission); *see also* U.S. Sentencing Comm'n, 60 Fed. Reg. at 25,077 ("Cocaine is

imported and distributed in powder form, meaning that those persons highest in the distribution chain — whom the Commission considers the most culpable and the most responsible for the nation's cocaine problem — deal only in powder" and thus sometimes receive shorter sentences than small-scale street dealers). Based on these findings, the Commission "unanimously and firmly" concluded that the 100:1 ratio was unjustified in light of congressional sentencing objectives and should be substantially narrowed. 2002 Report, *supra*, at viii.

### B.

It is of course significant that Congress has chosen not to enact the Sentencing Commission's repeated recommendations. Courts cannot impose a below-guidelines sentence based purely on a policy disagreement with the guidelines, even if this disagreement derives in part from the Commission's findings. It is for Congress, not the courts, to make policy judgments about which crimes are categorically worse than others. *See, e.g.*, *United States v. Evans*, 333 U.S. 483, 486 (1948). As the majority correctly observes, a sentencing court cannot systematically endorse a crack penalty ratio that it deems more fair and just than the 100:1 ratio, whether it be 20:1, 10:1, or 5:1. *Ante* at 12-13; *see United States v. Pho*, 433 F.3d 53, 64-65 (1st Cir. 2006).

Rather, as *Booker* instructs, sentencing courts must make individual sentencing decisions grounded in the factors of 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, ___, 125 S. Ct. 738, 757 (2005). More precisely, sentencing courts must first calculate the applicable guidelines range (after making the appropriate findings of fact) and then consider this range along with the factors sent forth in § 3553(a) before imposing a sentence. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). These factors include the nature of the offense, the history and character of the defendant, and the needs to "reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," protect the public, and avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct. 18 U.S.C. § 3553(a). As the majority correctly notes, courts are free to depart from the advisory guidelines range so long as the resulting sentence is reasonable in light of the various statutory factors. *Ante* at 13-14. In other words,

*proper consideration* of the § 3553(a) factors will render a sentence reasonable.

This framework should allow a sentencing court to consider the Sentencing Commission's reports when analyzing the § 3553(a) factors. The Commission's findings on the crack/powder disparity may inform a court's analysis of the § 3553(a) factors, particularly the need to impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offense, . . . promote respect for the law, . . . provide just punishment for the offense," [and] "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A)-(B). As I discussed in part I.A, the Commission's findings draw upon extensive evidence (empirical, academic, and otherwise). The amply supported findings are not made irrelevant simply because Congress did not act upon them, although the congressional response (rejection of the 1995 proposal and silence in response to the 1997 and 2002 reports) inevitably detracts from their overall significance. *See, e.g.*, *United States v. Perry*, 389 F. Supp. 2d 278, 307-08 n.33 (D.R.I. 2005) (noting that to disregard Commission's findings purely because Congress failed to adopt them would raise serious *Booker* concerns and that, for this reason, the congressional response to the findings, like the entire guidelines regime, should be treated as advisory only — as "part of the mix in applying the Guidelines on an advisory basis"); *United States v. Franklin*, No. 04-4000701SAC, 2005 WL 1330959, at *1 n.1 (D. Kan. 2005) (while "disparity in the Sentencing Guidelines between cocaine base and powder cocaine is not a valid basis for downward departure" in the Tenth Circuit, "[t]his is not to say that a sentencing court [post-*Booker*] may not consider this disparity" in evaluating certain § 3553(a) factors) (internal quotation marks and citations omitted). While the Commission's findings alone cannot justify a below-guidelines sentence, in certain cases they can help sentencing courts analyze the § 3553(a) factors and select a sentence that is "sufficient, but not greater than necessary" to punish, deter, and rehabilitate the defendant. 18 U.S.C. § 3553(a). The Commission's findings, in other words, can be considered insofar as they are *refracted through* an individual defendant's case.

In *Simon v. United States*, for example, the district court for the Eastern District of New York analyzed the circumstances relevant to § 3553(a), including the case's unusually long procedural history and

the defendant's family circumstances, prison record, and failing health. 361 F. Supp. 2d 35, 39-49 (E.D.N.Y. 2005). The court considered the Commission's findings only to the extent that they applied to § 3553(a)(2)(A) and (B): the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, be "just," and provide adequate deterrence to criminal conduct. Regarding the need for just punishment, § 3553(a)(2)(A), the court stated that it must "consider society's views as to appropriate penalties, not just a judge's own personal instincts." *Id.* at 43 (quoting Peter H. Rossi & Richard A. Berk, United States Sentencing Commission, *Public Opinion on Sentencing Federal Crimes* 6 (1995), *available at* http://www.ussc.gov/nss/jp_exsum.htm)); *see also* Rossi & Berk, *supra*, at 6 (stating that a just punishment should be "positively correlated with the punishment desired by the citizens"). The Commission's findings, insofar as they surveyed and studied public opinion on the crack/powder disparity, thus became relevant to the court's consideration of the § 3553(a)(2)(A) factor. A public opinion study sponsored by the Commission revealed that the public generally favors "the same median sentence" for crack, heroin, and powder cocaine offenses. *Simon*, 361 F. Supp. 2d at 47 (citing Rossi & Berk, *supra*, at 83). Citing this study, the court explained that "[w]here such a deviation between the Guidelines and public opinion exists, the reasonableness of the sentence [that the Guidelines] recommend diminishes," meaning that a just sentence may fall below the advisory range. *Id.* at 47.

Regarding the need to reflect the seriousness of the offense, § 3553(a)(2)(A), the *Simon* court considered the Commission's finding that the crack guidelines exaggerate the relative harmfulness of crack cocaine. *See id.* at 47-48 (citing 2002 Report, *supra*, at 93). The court cited evidence supporting the Commission's finding: namely, that the harms of prenatal exposure to crack cocaine and powder cocaine are identical and less severe than originally believed and that use by juveniles of crack cocaine is between two and seven times lower than use of powder cocaine. *See id.* (citing 2002 Report, *supra*, at 93-97). Nonetheless, the court recognized that crack offenses should be punished more severely than similar powder offenses, although not necessarily by a factor of 100, because crack is highly addictive and its harms "fall[ ] disproportionately on some of the most vulnerable in our community." *Id.* at 46 (citing 1995 Report, *supra*,

at 35). This examination of relative harmfulness also informed the court's consideration of the general deterrence factor, § 3553(a)(2)(B), which requires consideration of the harm resulting from the conduct to be deterred. *See id.* at 47-48 (citing 2002 Report, *supra*, at 93-97 and Rossi & Berk, *supra*, at 7). The court recognized that while the 100:1 ratio exaggerates crack's relative harmfulness, "[i]t is indisputable . . . that Congress has concluded that sentences for crack-related offenses are to be lengthy, and in particular more lengthy than similar powder cocaine offenses." *Id.* Ultimately, the court determined that these related statutory factors — seriousness of the offense and general deterrence — weighed in favor of a lengthy sentence, one significantly longer than what the court would impose for a similar powder cocaine offense, though not 100 times longer. *See id.* at 46, 48.

In this way, the district court in *Simon* used the Commission's findings as a resource in its analysis of the § 3553(a)(2)(A) and (B) factors, but not to categorically reject the 100:1 ratio in favor of some alternative ratio. *See id.* at 46 ("It is, however, not for this Court to adopt a specific ratio, but instead to craft a sentence that is reasonable and best satisfies the requirements of § 3553(a). In doing so, I rely in part on the research of the Commission and other sources, whose expertise in these matters is entitled to some deference."). Moreover, Commission findings did not figure at all in the *Simon* court's consideration of many of the § 3553(a) factors, for example § 3553(a)(1), which enabled the court to take into account the case's long procedural history and the defendant's severely failing health, and § 3553(a)(2)(C), which enabled the court to evaluate the specific risk of recidivism. *See id.* at 41-43, 47-48. The court thus invoked the Commission's findings to support a below-guidelines sentence that was reasonable principally because of the individualized factors of § 3553(a).

The district court in *Simon* took care to respect § 3553(a)(6), which highlights the need to avoid unwarranted disparities among defendants with similar records who have been convicted of similar conduct. *See id.* at 48-49. The court cited a number of individualized mitigating factors, including the defendant's acute and worsening medical condition and the long delay he experienced before achieving finality, that differentiated his case from other similar cases. *See id.*

Thus, although the court relied in part on the Commission's findings to impose a below-guidelines sentence, the court gave adequate consideration to § 3553(a)(6) and explained the case-specific factors that warranted a disparate sentence.

*Simon* illustrates that a sentencing court can use the Sentencing Commission's findings in considering the § 3553(a)(2)(A)-(B) factors while still respecting § 3553(a)(6). The court satisfied Congress's overall sentencing goals, as reflected in § 3553(a), by using the Commission's findings to sharpen and support its consideration of case-specific factors. These findings enabled the court to evaluate more precisely the somewhat abstract factors in § 3553(a)(2)(A)-(B): just punishment, seriousness of the offense, and general deterrence. By consulting the Commission's reports, the court drew on the accumulated expertise of many who have studied or dealt with the crack guidelines (judges, prosecutors, defense lawyers, police, medical and scientific experts, and academics). The court thereby bolstered its rationale for imposing a below-guidelines sentence and demonstrated fully that the sentence imposed was reasonable in light of all of the relevant § 3553(a) factors.

I do not mean to suggest that sentencing courts must consider the Commission's findings and, based on these findings, impose a below-guidelines sentence. *See United States v. Gipson*, 425 F.3d 335, 337 (7th Cir. 2005) (holding that it was not error for the sentencing court "*not* to have taken the [100:1] differential into account" when sentencing crack offender within guidelines range); *United States v. Cawthorn*, 429 F.3d 793, 802-03 (8th Cir. 2005) (adopting Seventh Circuit's reasoning in *Gipson*). Rather, I simply suggest that a sentencing court does not automatically err by considering the Commission's findings when analyzing the factors of § 3553(a), as long as these findings do not form the sole basis for imposing a below-guidelines sentence (by, for example, categorically endorsing a 20:1 or 10:1 ratio instead of the 100:1 ratio embedded in the guidelines). Case-specific factors must primarily drive the sentence. *See Simon*, 361 F. Supp. 2d at 39-49; *see also United States v. Williams*, No. 05-11594, ___ F.3d ___, 2006 WL 68559, at *4-*5 (11th Cir. Jan. 13, 2006) (upholding below-guidelines sentence for crack offense as reasonable in light of § 3553(a) factors and explaining that district court gave "specific, valid reasons" for sentence rather than "bas[ing sen-

tence] solely on its disagreement with the Guidelines"). Because there are no case-specific facts to justify a below-guidelines sentence for Eura, I join the majority in vacating his sentence and remanding for resentencing at the low end of the guidelines range.