**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 05-4984**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LAURENCIO GONZALEZ,

Defendant - Appellant.

---

**No. 05-4988**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSE JESUS GUTIERREZ, a/k/a Chuey,

Defendant - Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore.  William D. Quarles, Jr., District Judge. (CR-03-405)

---

Argued:  November 30, 2006          Decided:  March 14, 2007

---

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Emanuel M. Levin, EMANUEL M. LEVIN & ASSOCIATES, P.A., Baltimore, Maryland; Caroline D. Ciraolo, ROSENBERG, MARTIN & GREENBERG, L.L.P., Baltimore, Maryland, for Appellants. Jefferson McClure Gray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, James G. Warwick, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Defendants Laurencio Gonzalez and Jose Jesus Gutierrez were convicted of conspiracy to import and distribute cocaine and marijuana supplied by a large narcotics cartel in Tijuana, Mexico. Defendants raise several challenges to their convictions and sentences. We affirm.

I.

Between mid-2002 and October 2004, Gonzalez and Gutierrez operated a successful narcotics trafficking business based in Los Angeles, California. Claiming to have close ties to the Tijuana cartel, Defendants supplied cocaine to purchasers across the country in a number of cities, including Chicago, Washington, D.C., and Norfolk, Virginia.

In December 2002, Gonzalez met Fred Brooks, a Baltimore-area distributor who had developed the ability to move large amounts of narcotics supplied by Jose Mendoza, a Los Angeles marijuana dealer who knew the Defendants. Soon Gonzalez was supplying Brooks with regular deliveries of cocaine for Brooks to distribute in the mid-Atlantic region. Gonzalez delivered the cocaine to Brooks by means of individual couriers who were recruited and then supervised by Gutierrez. Gutierrez told Brooks that "he was the person in charge of the couriers" and was responsible for "pick[ing] up the money and the drugs for [Gonzalez]." J.A. 228. Gutierrez recruited

3

female couriers to drive sport utility vehicles with the cocaine packed into spare tires affixed underneath the vehicles. After dispatching the couriers on their drug runs, Gutierrez followed them in a separate vehicle. Gutierrez was ultimately responsible for making sure that the cocaine was distributed and payment was collected.

By May 2003, Gonzalez and Gutierrez were sending as much as 40 kilograms of cocaine to Baltimore every ten days. Gonzalez and his girlfriend flew to Baltimore to discuss increasing the amount of cocaine he was fronting to Brooks. During the trip, Gonzalez rented a car and drove to Chicago, another distribution hub. Law enforcement officers eventually obtained the receipt for the rental car in a search of Gonzalez's garage.

Shortly after the meeting between Brooks and Gonzalez, two of Gutierrez's couriers were stopped outside of Nashville, and law enforcement discovered 27 kilograms of cocaine marked SOTO, a mark associated with drugs distributed by the Tijuana cartel. One of the couriers was carrying notes with Gutierrez's nickname. The arrest caused Gonzalez to change his method of delivering the narcotics to the east coast, adopting the system developed by Brooks and Mendoza for shipping marijuana across the country. Brooks built large electrical power cases which Defendants used to hide the drugs; the cases were shipped by air to Brooks. Brooks

4

would return the cases to the west coast stuffed with the cash proceeds of his drug sales.

In August 2003, customs agents arrested Brooks and recovered substantial quantities of narcotics from his apartment, including 33 kilograms of cocaine marked SOTO. Brooks, who received a large shipment of cocaine immediately before his arrest, cooperated with authorities to set up a sting. Brooks notified Mendoza that he had shipped the cash proceeds in the usual manner; authorities, however, had packed the electrical cases with paper. When couriers arrived to pick up the cases, law enforcement officials stopped them and pretended to have been tipped off about the cash. This prompted Gonzalez and Gutierrez to travel to Baltimore to meet with Brooks in person to discuss the situation. Gonzalez proposed a solution that would permit them to continue the business relationship with Brooks, and the meeting ended amicably. Brooks then cut off contact with Gonzalez and Gutierrez.

Gonzalez was arrested on October 28, 2004, in his Los Angeles apartment. At approximately 1:00 p.m., six or seven officers executed the arrest warrant for Gonzalez, handcuffing him in his living room and then performing a protective sweep of the apartment to ensure no one else was present.

The arresting officers asked Gonzalez for permission to search the apartment, to which Gonzalez replied, "I don't have anything to hide." J.A. 138. Gonzalez signed a written consent form regarding

the apartment. Although the consent form did not refer to Gonzalez's separate garage unit, Gonzalez identified the garage associated with his apartment unit. The search turned up numerous cell phones that had logged calls to Gutierrez and Mendoza. Also, officers found in the garage the rental car agreement Gonzalez kept from his May 2003 Baltimore meeting with Brooks. And, officers discovered tally sheets for cocaine sales, as well as documents printed from the website for the federal district court in Maryland where Brooks made his initial appearances.

Gonzalez and Gutierrez were charged with conspiracy to import cocaine and marijuana from Mexico into the United States, and conspiracy to distribute and possess with intent to distribute cocaine and marijuana. Gonzalez and Gutierrez were appointed counsel. About two weeks before trial was scheduled to begin, Defendants filed identical pro se motions asserting that their attorneys were hindered by a "conflict of interest" arising from the attorneys having sworn an oath as lawyers "to support [Defendants'] 'adversary' the UNITED STATES OF AMERICA and the US District Court." J.A. 103. Additionally, Gonzalez and Gutierrez each filed an affidavit essentially asserting that the district court lacked subject matter jurisdiction and was required to dismiss their cases.

During a hearing on Defendants' motion for a bill of particulars less than two weeks before trial, both Gonzalez and

6

Gutierrez notified the court that they had fired their court-appointed attorneys and restated their belief that the court lacked jurisdiction. Neither Gonzalez nor Gutierrez, however, indicated that he wished to represent himself. In fact, in their written motions filed prior to trial, both Gonzalez and Gutierrez indicated they "want[ed] counsel" but could not find any attorney who was not conflicted by the oath. J.A. 103. The court explained that Defendants could proceed to trial with their court-appointed attorneys or they could represent themselves. Defendants were non-responsive to the court's questions, repeatedly stating their belief that the court lacked jurisdiction and that they had fired their attorneys. Defendants repeated this tactic throughout the course of the trial. Defendants never invoked the right to represent themselves and even refused opportunities to cross-examine witnesses after objecting to the participation of their court-appointed attorneys.

Following a five-day trial, the jury convicted Gonzalez and Gutierrez on both conspiracy counts. Gonzalez received a 540-month sentence and Gutierrez received a 480-month sentence.

## II.

## A.

Defendants contend that the district court committed reversible error in its handling of their pro se "motions."

7

Defendants first argue that the district court's refusal to discharge their court-appointed lawyers violated their implied right to self-representation under the Sixth Amendment. See Faretta v. California, 422 U.S. 806, 819 (1975).

The "exercise of the right of self-representation necessarily entails a waiver of the right to counsel--a defendant obviously cannot enjoy both rights at trial." United States v. Frazier-El, 204 F.3d 553, 558 (4th Cir. 2000). Therefore, the assertion of the right of self-representation must be clear and unequivocal. See Faretta, 422 U.S. at 835; Frazier-El, 204 F.3d at 558. This requirement guards against the inadvertent waiver of the right to counsel as well the manipulation of "the mutual exclusivity of the rights to counsel and self-representation." Frazier-El, 204 F.3d at 559. If the assertion of self-representation is ambiguous, the right to counsel enjoys "constitutional primacy." United States v. Singleton, 107 F.3d 1091, 1102 (4th Cir. 1997). The right of self-representation is not absolute and sometimes must give way to "the government's interest in ensuring the integrity and efficiency of the trial." Martinez v. Court of Appeal of California, 528 U.S. 152, 161-62 (2000).

Defendants did not assert their right of self-representation expressly or implicitly -- and certainly they did not do so in the required clear and unequivocal fashion. Gonzalez and Gutierrez point only to their repeated assertions that they had fired their

8

attorneys, which did not indicate an intention to proceed pro se. See Frazier-El, 204 F.3d at 559. To the extent that Defendants' obstructive conduct created ambiguity regarding their intent to represent themselves, the district court's refusal to discharge counsel was proper in view of the preeminence of the right to counsel. See Singleton, 107 F.3d at 1096. Accordingly, we conclude that the district court did not commit error in having Defendants proceed to trial with appointed counsel.

### B.

Defendants next argue that the district court was required but failed to conduct a hearing on their pro se motions. We disagree.

Defendants' motions were, on their face, completely frivolous. As for the argument that the court lacked jurisdiction, Defendants apparently believed that because the indictment spelled their names using all capital letters, the government failed to properly identify them as "real, live flesh and blood M[en]." J.A. 105. Appellate counsel concedes the legal absurdity of these claims. For that reason alone, no formal hearing was required to address this issue.

The bases for Defendants' pro se motions to dismiss counsel were equally frivolous. Gonzalez and Gutierrez claimed that their court-appointed attorneys were unable to provide sufficient representation because of a conflict of interest inherent in the

oath administered to prospective attorneys seeking admission to the bar, requiring them to support and defend the Constitution. Presumably, Defendants believe their attorneys, having taken the oath, are beholden to the United States government, which is in an adversarial posture to Defendants. Defendants, however, never invoked their right to self-representation or indicated in any way that they wished to represent themselves at any point during the trial. Rather, Defendants repeatedly stated throughout the trial only that their court-appointed attorneys had been fired and did not represent them; however, when offered an opportunity to cross-examine a witness in lieu of counsel, Defendants typically responded simply that "I don't consent to the proceedings." J.A. 214.

By the same token, Defendants never requested new counsel. Indeed, Defendants acknowledged that their basis for objecting to court-appointed counsel -- the attorney's oath -- eliminated new counsel as well: "Matter of fact I want counsel, yet every attorney I have spoken to has a 'conflict of interest' because he has sworn an 'oath' to support my 'adversary' the UNITED STATES OF AMERICA and the US District Court." J.A. 103. Thus, Defendants adopted an obstructionist position, neither requesting new counsel nor invoking the right to self-representation. Accordingly, for the district court to have conducted a formal hearing would have been pointless.

10

Nevertheless, Defendants suggest that the district court should have conducted a hearing to ensure Defendants understood the self-defeating course they were pursuing and its consequences. Defendants claim that, in fact, the district court's comments encouraged them to continue with their strategy. Specifically, Defendants point to the court's observation that Defendants were "probably not doing yourself much harm either, so, if it makes you feel good to say those things or repeat those things, then certainly you should do that . . . ." J.A. 128.

We disagree. The district court made clear throughout the trial that Defendants could rely on counsel or represent themselves, but that their decision to do neither one was mistaken and doomed to fail:

> THE COURT: Okay. Mr. Gutierrez, . . . the Government is paying for your attorney. The Courts are paying for your attorney. Your choices are generally to go to trial with [your current attorney] or to go to trial by yourself. I would urge you to consult with [your attorney] with a view to resolving the differences between you.
>
> . . .
>
> DEFENDANT GUTIERREZ: Are you aware I object? I don't consent. I don't understand. I never signed anything.
>
> . . .
>
> THE COURT: Okay. You talked to someone in prison, haven't you? You've had a prison lawyer helping you, haven't you?
>
> DEFENDANT GUTIERREZ: I object.
>
> THE COURT: Yes.

11

DEFENDANT GUTIERREZ: I don't consent. I don't understand. I never signed anything.

. . .

THE COURT: Mr. Gutierrez, in determining whether you should be following the advice of a prison lawyer, you should probably notice that he is in prison, and that is probably an indication that he is not particularly good at his avocation of giving legal advice. I would advise you to consult with your attorney. . . .

DEFENDANT GUTIERREZ: Are you aware, Judge, I object, I don't consent, I don't understand, and I never signed any contract with this Court or any agency or agent affiliated with this Court that compelled the specific terms and conditions?

THE COURT: . . . It's unfortunate, but there are many sort of misimpressions floating around prisons. This is criminal laws, not contracts. People behind bars with little education and no legal training make all sorts of mistakes about the law, and then they convince other people that they've got a basis for relief, and then these people come into court, . . . say[ing] silly things like you're saying, and then they end up serving years and years in prison . . . .

So it is truly sad when someone gets fooled or conned into believing that he has discovered some secret way out of prison by saying a few magic words that have just no basis in the law or anything else, and obviously I don't have any ability to make you see that you've been conned, and that those words that you say which you probably believe in are not magic words. They're not going to get you out of this scrape, so, if you wish to continue, you may do that, but you're not doing yourself any good.

J.A. 126-28.

12

Considering the entirety of the district court's comments, we conclude the district court communicated in unequivocal fashion the folly of Defendants' approach.

Moreover, it is unclear why a formal hearing would have made the slightest difference. Defendants were completely nonresponsive to the district court's questions regarding how they wished to proceed. Defendants have not demonstrated that a hearing would have resulted in cooperation from Gonzalez or Gutierrez as to the issue of representation. We conclude that the district court did not commit error in failing to conduct a hearing with respect to this issue.

III.

Gonzalez argues that the warrantless search of his apartment and garage was unlawful and required the suppression of the evidence recovered in the search. Under the Fourth Amendment, warrantless searches are unreasonable per se unless an exception to the warrant requirement applies. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Consent to search by the suspect or property owner is an exception, but the government carries the burden of showing that the consent was given freely and voluntarily. See id. at 222.

Around mid-day on October 28, 2004, six or seven officers from the Los Angeles Sheriff's Department went to assist in the

13

execution of an arrest warrant for Gonzalez at his one-bedroom apartment.  The officers, wearing SWAT gear, found Gonzalez in his living room, handcuffed him and performed a protective sweep of the apartment to ensure no one else was present.  After the officers determined the apartment was secure, one of them asked Gonzalez for consent to search the apartment.  When Gonzalez stated that he had nothing to hide, officers presented him with the following Consent to Search form which was read to him in English and Spanish, which he signed:

> I, LAURENCIO GONZALEZ, HEREBY AUTHORIZE OFFICER GREG THURMAN (TFO), OF THE HIDTA TASK FORCE TO CONDUCT A COMPLETE SEARCH OF THE PREMISES LOCATED AT 10526 OTIS ST. #A SOUTH GATE.  THIS OFFICER, AND OTHERS WHO MAY ASSIST HIM, ARE AUTHORIZED BY ME TO ENTER THE PREMISES AND CONDUCT ANY NECESSARY INVESTIGATION, INCLUDING, BUT NOT LIMITED TO, TAKING PHOTOGRAPHS, PERFORMING CHEMICAL TESTS, LIFTING FINGERPRINTS, AND REMOVING ANY ITEMS THEY DEEM OF INVESTIGATIVE VALUE OF POSSIBLE EVIDENCE. . . . THIS WRITTEN PERMISSION IS BEING GIVEN BY ME TO THE ABOVE NAMED OFFICER . . . VOLUNTARILY AND WITHOUT THREATS OR PROMISES OF ANY KIND.

J.A. 102.

Gonzalez also had a garage unit that was not physically attached to the apartment but was located within the complex.  The Consent to Search form did not specifically reference the garage; however, Detective Thurman testified that he discussed the garage with Gonzalez and obtained consent specifically for a search of the garage.  After Gonzalez identified his garage, the officers conducted the search of both the apartment and the garage.

14

Prior to trial, Gonzalez moved to suppress the evidence recovered in this search. The district court denied the motion, finding that the "uncontradicted testimony is the search was conducted pursuant [to] a consent to search [form] obtained voluntarily from the defendant Gonzalez." J.A. 198. We review the district court's factual determination that Gonzalez voluntarily consented for clear error. See Schneckloth, 412 U.S. at 248-49.

Gonzalez argues the district court clearly erred in finding that his consent was voluntary, in that he was handcuffed and surrounded by numerous officers in his small apartment when he signed the form. In determining the voluntariness of a suspect's consent to search, the district court must take into account the totality of the circumstances surrounding the consent. See id. at 227. The question is whether a reasonable person in the suspect's position "would have felt free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 438 (1991). Relevant to the totality of the circumstances review are factors such as the suspect's age, intelligence, education, experience with the justice system, as well as the conditions surrounding the consent, such as the number of officers present, the duration of the relevant events, and the place and time of the consent. See United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc).

We conclude that the district court's finding of voluntariness was not clearly erroneous. In addition to the consent form itself, which was read to Gonzalez, testimony from arresting officers established that Gonzalez was very calm -- even cooperative -- during the search, not confused or intimidated. According to Detective Thurman, "[Gonzalez] said, yes, to search everything. He had nothing to hide. . . . He was very cooperative, polite. He didn't seem worried or concerned about our presence. . . . [I]t didn't appear to him that it was a very big deal we were even there." J.A. 165. And, at 35, Gonzalez had more than passing familiarity with the justice system, having been arrested previously a number of times. In view of this evidence, we cannot say the district court's conclusions constituted clear error.

Gonzalez also argues that, to the extent he consented to the search, the officers exceeded the scope of that consent. Primarily, he argues that his consent did not extend to the garage. A person may limit the scope of his consent; however, if no express limit is imposed by the suspect, then the issue is what a reasonable person under the circumstances would believe is included within the scope of the consent. See Florida v. Jimeno, 500 U.S. 248, 251 (1991). Although the consent form did not refer to the garage as part of the premises to be searched, Detective Thurman testified that he specifically asked Gonzalez about the garage and received permission to search. Gonzalez points out that Officer

16

Roche testified that he did not hear anyone ask specifically about the garage. But Roche's testimony does not render the court's findings clearly erroneous. Roche's testimony is not even inherently inconsistent with Thurman's; he merely testified that he did not hear Thurman or anyone else ask Gonzalez about a garage. Because Thurman's testimony was ultimately the only evidence specifically addressing the garage, the district court had a sufficient basis for finding that the search of the garage did not exceed the scope of Gonzalez's consent.[1]

IV.

Gonzalez and Gutierrez contend that the district court improperly applied a four-level "leadership role" enhancement under § 3B1.1(a) in determining their advisory guidelines sentences. In calculating an offender's total offense level under the sentencing guidelines, the sentencing court must impose an upward adjustment of four levels if the offender was "an organizer or leader of a

---

[1] Gonzalez raises a new theory on appeal, suggesting that the officers remained on the premises longer than necessary to arrest Gonzalez and were therefore "unlawfully present" when they asked for consent to search the premises. Gonzalez contends that this unlawful presence nullified the consent and tainted the subsequent search. Because Gonzalez failed to present this argument to the district court below, we review it only for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993). We need not expressly address this claim, except to say that it falls far short of meeting the exacting plain error standard.

criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).

Defendants do not challenge the district court's finding that the conspiracy involved more than five individuals.  Accordingly, the question is whether Gutierrez or Gonzalez "was an organizer, leader, manager or supervisor of people."  United States v. Sayles, 296 F.3d 219, 226 (4th Cir. 2002).  To qualify for this particular enhancement, the defendant need not have served in a leadership capacity as to all of the other participants.  It is only necessary that defendant was "the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1, comment. n.2 (emphasis added).

The Guidelines list seven factors for the sentencing court to consider in determining whether a defendant played a leadership role:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. n.4.

The "recruitment of accomplices" factor is particularly applicable with regard to Gutierrez, who was in charge of the couriers.  Gutierrez recruited drivers and "shadowed" them on their

18

cross-country drug runs. Brooks testified that when Gutierrez delivered narcotics to him, he was always with his female couriers, although he kept them out of sight. Gutierrez explained that the arrest of the two couriers would not sink the entire operation because "they only knew [Gutierrez]." J.A. 243. Thus, the coast-to-coast delivery system was directed by Gutierrez, and the evidence suggests he was the only leader with whom the couriers had contact. Gutierrez was ultimately responsible for the completion of the couriers' delivery duties, which were substantial given the frequency -- Brooks received delivery every ten days -- of the cross-continent drug runs prior to the Nashville arrests in May 2003. Gutierrez arranged and "determined the details and logistics of the [narcotics] deliver[ies]" and payments, which qualify as leadership activities for purposes of the supervisory role enhancement under U.S.S.G. § 3B1.1(a). See United States v. Skoczen, 405 F.3d 537, 549-50 (7th Cir. 2005). We conclude that, on the record before it, the sentencing court did not clearly err in applying the four-level increase under U.S.S.G. § 3B1.1(a).

Gonzalez asserts a similar challenge to the leadership role enhancement imposed with respect to his sentence, arguing that he was merely a sales agent for the Tijuana drug cartel, not a leader. The evidence clearly permits the conclusion, however, that Gonzalez asserted authority over Gutierrez, made final decisions regarding the shipping method after Brooks and Mendoza presented the idea for

his consideration, and traveled to Maryland to make decisions in response to setbacks such as the arrests or the interception of Brooks's shipment of "cash." We conclude that the sentencing court's finding that Gonzalez played a leadership role that merited a four-level increase to his offense level under U.S.S.G. § 3B1.1(a) was not clearly erroneous.[2]

## V.

For the foregoing reasons, Defendants' convictions and sentences are affirmed.

AFFIRMED

---

[2]Defendants also argue that the district court failed to consider all of the factors set forth in 18 U.S.C. § 3553(a) and imposed unreasonable sentences. We disagree. "[A] district court need not explicitly discuss every § 3553(a) factor on the record." United States v. Eura, 440 F.3d 625, 632 (4th Cir. 2006), petition for cert. filed, ___ U.S.L.W. ___ (U.S. June 20, 2006) (No. 05-11659). The district court imposed sentences that fell within the lower half of Defendants' guidelines ranges, and "a sentence imposed within the properly calculated Guidelines range . . . is presumptively reasonable." United States v. Green, 436 F.3d 449, 457 (4th Cir.) (internal quotation marks omitted), cert. denied, 126 S. Ct. 2309 (2006). We conclude Defendants have failed to rebut the presumption of reasonableness.

20